In re Application of Creighton.

[Cite as *In re Application of Creighton,*
117 Ohio St.3d 253, 2008-Ohio-852.]

(No. 2007–1818—Submitted January 9, 2008—Decided March 5, 2008.)

_____

**Per Curiam.**

{¶ 1} Carroll R. Creighton graduated in December 2006 from Ohio Northern University Pettit College of Law and has applied to take the Ohio bar examination. The Board of Commissioners on Character and Fitness recommends that we disapprove the application and deny the applicant permission to reapply until the July 2008 bar exam based on findings that he did not disclose in his applications for law school and to register for admission to the bar that he had been disciplined for improprieties as a school teacher. We accept the board's recommendation to disapprove; however, we deny the applicant permission to reapply for any bar exam before the July 2009 exam and further order him to submit a psychological assessment upon his reapplication.

{¶ 2} The applicant, a former high school teacher, initially applied to take the February 2007 bar exam. Although the Hardin County Bar Association's bar admissions committee approved his character, fitness, and moral qualifications for admission to the Ohio bar, the applicant did not receive the board's final approval before the test date. The applicant would later apply to take the July 2007 bar examination.

{¶ 3} In March 2007, the board invoked its authority under Gov.Bar R. I(10)(B)(2)(e) to sua sponte investigate the applicant's qualifications. The board's

letter notifying the applicant of the investigation stated that the board had reservations about disclosures on his application to register for bar admission concerning "two instances of questionable conduct with female students." The board appointed a panel of three board members, and in June 2007, the panel conducted a hearing in the matter.

{¶ 4} A special investigator presented evidence of incidents at Pandora–Gilboa High School that had led to disciplinary action against the applicant and his later resignation. Evidence also established that the applicant had made various ambiguous and misleading statements in both his application for law school and his application to register for bar admission. The panel recommended that the applicant's application to take the bar exam be disapproved and that he be denied permission to reapply for the test until July 2008. The board adopted this recommendation.

### The Underlying Improprieties

{¶ 5} After graduating from Ohio Northern University as an undergraduate in May 2003, the applicant, then 22, accepted a one-year teaching position for the 2003–2004 school year. In September 2003, a local police officer observed the applicant and one of his students talking in the student's car in a parking lot around 11:30 p.m. The officer reported the incident to the high school principal, who immediately reprimanded the applicant for violating rules against teachers' fraternizing with students.

{¶ 6} In April 2004, the principal again confronted the applicant, this time about a more serious infraction. A 15–year–old female student had reported to her parents that the applicant had come to their home during the fall of 2003 while her parents were not there. According to the student, the applicant had kissed her on the mouth while they were talking outside.

{¶ 7} The applicant denied the girl's accusation. But a school guidance counselor's investigation of the allegation unearthed a number of complaints from other female students about the applicant's having made excessively complimentary or suggestive remarks that made them uncomfortable. School administrators placed the applicant on an administrative leave of absence as of April 13, 2004, and he resigned his position two weeks later.

{¶ 8} During April and May 2004, Putnam County Job and Family Services investigated the kissing incident as a report of sexual abuse. On the advice of his attorney, the applicant did not participate in that investigation. The agency disposed of the case, finding "sexual abuse indicated."

{¶ 9} In July 2006, the Ohio Department of Education notified the applicant that it intended to determine whether to revoke his teaching permit based on his inappropriate personal contacts and relationships with students. The applicant

forwent the available hearing procedures, and a hearing officer recommended that the department find him in violation of R.C. 3319.31(B)(1) (prohibiting conduct unbecoming a teacher). The department apparently either has or will disqualify the applicant from applying for any teaching license, certificate, or permit in the future.

{¶ 10} The full extent of the applicant's relationship with the 15–year–old–girl did not come to light until the character and fitness investigation. The special investigator learned that, in fact, the applicant had carried on a month-long romantic relationship with the girl and had engaged in additional improprieties. The applicant had kissed the girl when she accepted an invitation to his apartment, and he had visited the girl at her home at least twice while her parents were not there. On one of those occasions, the applicant kissed the girl as they sat on a sofa, and they then went to a bedroom for another kissing session. The applicant, well aware of the impropriety of the situation, tried to conceal the relationship and talked with the girl about "what would happen if her parents found out."

### The Applicant's Failure to Disclose

{¶ 11} On July 16, 2004, the applicant applied to law school at Ohio Northern University. When asked on the application whether he had ever been disciplined for unethical conduct as a member of any profession or professional organization, the applicant falsely checked no. The application also asked for the applicant's personal statement about what in his background distinguished him as a potential law student. The applicant's statement generally criticized the teaching profession, lamenting the parents' "paranoia" and school administrators' "fear [of] liability." And in this passage, the applicant reiterated his denial of having been involved with a student:

{¶ 12} "I was well on my way to becoming indoctrinated in the ways of fear and liability when my [school] year ended quite abruptly. On April 17th, a female student had accused me of kissing her, six months prior, and claimed that Easter had made the guilt too much to bear. I was placed on administrative leave immediately, *even amidst my denials of the incident.*

{¶ 13} "And then began the first inkling that teaching may not be for me, and that perhaps a different field might be more suited for my talents. * * * I realized that maybe words, seemingly so powerless in my battles with the Board of Education of Pandora–Gilboa Local Schools, might have more power if they were reinforced by a law degree." (Emphasis added.)

{¶ 14} Two years later, on August 14, 2006, the applicant supplemented his law-school application to clarify several items. He stated that he had mistakenly answered no when asked whether he had been disciplined as a member of a

professional organization or a profession. He explained that he had carelessly focused only on the "professional organization" part of the inquiry. The applicant then revealed details about the parking-lot incident and admitted that he had received a reprimand because of it. He also referred again to his administrative leave of absence, this time adding that he had resigned from his teaching position afterward. The applicant further disclosed that his pupil-activity supervisory permit, which had allowed him to coach high school soccer, had recently come under review by the Department of Education. The applicant did nothing, however, to retract his denials of the kissing incident or to acknowledge the impropriety of his conduct.

{¶ 15} The day after he supplemented his law-school application, the applicant filed his application to register as a candidate for admission to the bar. In answer to the question "Have you ever failed to answer fully and truthfully all questions on an application for admission to any educational institution?" he answered yes, explaining:

{¶ 16} "On my application [to law school], I misunderstood the question regarding disciplinary procedures as a member of a profession or professional organization. I read the question as member of a professional organization only. I have discussed this with Assistant Dean Christoff on or about the first of August. I submitted a supplement to my application as of Monday, 8/14/06. The disciplinary action as a member of a profession that I should have referred to is disclosed later on this application under the pertinent section."

{¶ 17} When instructed by the registration application to list all periods of his employment and provide the reason for leaving, the applicant described his reason for leaving Pandora–Gilboa Local Schools as follows: "Resignation in lieu of termination due to allegations of misconduct involving a female." Then, in answer to the question "Have you ever been terminated, suspended, disciplined, or permitted to resign in lieu of termination from a job?" the applicant answered yes and explained these circumstances:

{¶ 18} "Allegations arose stating that I had kissed a female student. I was placed on administrative leave on or about April 17, 2004, and then entered my resignation on or about April 29, 2004."

{¶ 19} He also disclosed:

{¶ 20} "I was issued a written reprimand for improper conduct with a student, dated in September of 2003. She and I were sitting outside her church in the parking lot across the road late at night, speaking about her life and issues she was having at the time."

*The Appropriate Disposition*

{¶ 21} An applicant to the Ohio bar must prove by clear and convincing evidence that he or she "possesses the requisite character, fitness, and moral qualifications for admission to the practice of law." Gov.Bar R. I(11)(D)(1). The applicant's record must justify "the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them." Gov.Bar R. I(11)(D)(3). Necessarily, "[a] record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for disapproval of the applicant." Id.

{¶ 22} The board expounded on the gravity of this applicant's misdeeds:

{¶ 23} "Mr. Creighton indisputably failed to demonstrate the trustworthiness expected of a professional, whether a teacher or a lawyer, with respect to his conduct with young female students during the 2003–2004 school year. He was not forthright in disclosing to the Ohio Northern University College of Law the circumstances that led to his resignation from the teaching position. Perhaps more damaging, when he supplemented his law school application in August 2006, Mr. Creighton referred again to his personal statement that can only be fairly read as including a denial that he was guilty of the allegation of kissing a student when he was, in fact, guilty of that and more. The statements on his application to register for admission to the Bar are similarly incomplete and misleading."

{¶ 24} Since the board's investigation began, the applicant has divulged the details of his wrongdoing. He told investigators about the improprieties in which he had engaged as a teacher, admitting the truth of all the allegations against him and the falsity of his denials. The applicant acknowledged that he had breached professional responsibilities both in having an unacceptable relationship with his student and in failing to fully reveal the circumstances that led to his resignation on his law-school and bar-registration applications. And in conceding this wrongdoing, he also acknowledged that his answers to some application questions were intentionally misleading.

{¶ 25} The applicant also admitted that he had failed to disclose that he had been disciplined as a teacher, although he continued to maintain that he had done so inadvertently because he had misread the question about whether he had been disciplined as a member of a profession.

{¶ 26} At the panel hearing, the applicant frankly admitted that he had not possessed the requisite character and fitness for bar admission in April 2004, when he resigned from teaching, or in the two years that followed. He had no explanation for his denying and shading the truth except that he was ashamed of what he had done. He testified that he had told himself that if he was ever directly asked about his relationship with the girl, he would tell the truth.

{¶ 27} The applicant insisted, however, that he had undergone dramatic character changes since November 2006, when he joined St. Stephen's Orthodox Mission Church. He said that he now welcomed the opportunity to disclose what he had done and rid himself of any secrecy surrounding the events of his past. The applicant apologized to the panel at length, saying:

{¶ 28} "It's my own fault I'm here and that fault starts back when I was a teacher at Pandora–Gilboa. My actions there were inappropriate and inexcusable * * *."

{¶ 29} "I'm here today to clearly and unambiguously attempt to help this Panel make a just decision on whether I should be an attorney and also to accept responsibility for my actions * * * and to tell the truth in a way that I have not. I'm here both to accept responsibility for my actions at Pandora and also to do so for failing to disclose on my applications, both my law school application and Bar application, which had ambiguous answers, as to why I had to resign."

{¶ 30} "I understand that past actions do reflect heavily, and that is basically the only way this Panel has to look and see what kind of person I am. I hope today that I can show * * * that since basically November 19 of last year I joined St. Stephen's Orthodox Mission and since that point I have begun a new phase, a new process in my life of repentance and of holding myself accountable, since at some point I will be held accountable for all my actions on this earth * * *."

{¶ 31} When asked why he continued as late as August 2006 to give ambiguous statements regarding his teaching record and whether he still adhered to the views expressed in the personal statement that he submitted with his law-school application, the applicant testified:

{¶ 32} "As I was reading my statement I realized, I was actually amazed and ashamed of my own arrogance * * *. * * * I was still trying to hide and still trying to run from what I had done and still trying not to accept responsibility for it."

{¶ 33} "[M]y character as of right now is different * * * because of church and of Christ and that didn't really happen until—it began in June of last year but didn't really fully come to its fruition until I started attending St. Stephen's and became a part of that community and accountable to that community, and so I understand and fully accept * * * your reservations because you're right."

{¶ 34} The applicant's minister, two long-time friends, and a member of the church congregation attested to the applicant's good character and integrity. All of these witnesses were familiar with the applicant's past misdeeds but still trusted in him. The minister and long-time friends, all of whom had children,

also testified that they would or had entrusted the applicant with their children's care.

{¶ 35} In *In re Application of Kohler*, 115 Ohio St.3d 11, 2007–Ohio–4261, 873 N.E.2d 818, a bar applicant made numerous false representations to clients and to partners in a law firm where he worked as a law clerk. He also created bogus documents to conceal his false statements, and his deception went on for several months. None of the four clients he assisted suffered injury, but the applicant's dishonesty cast serious doubt on his ability to abide by ethical standards. That applicant had applied for and passed the February 2006 bar exam, but we denied him admission to the bar and prohibited him from reapplying for admission before February 2008. Id. at ¶ 1 and 18.

{¶ 36} We did not bar the applicant in *Kohler* from ever applying again to the practice of law because he recognized the gravity of his transgressions and had shown overwhelming contrition. The applicant's youth and inexperience also factored into our decision, as did the fact that he at least took the initiative to report his wrongdoing to authority figures. Id., 115 Ohio St.3d 11, 2007–Ohio–4261, 873 N.E.2d 818, ¶ 16–17. In contrast, the applicant in this case attempted to conceal his even more troubling misdeeds in response to direct questioning.

{¶ 37} Given his past behavior, this applicant may never be able to produce clear and convincing proof that he is qualified to be a member of the Ohio bar. He persuaded the panel and board to give him a second chance, however, to the extent that both recommended that he be permitted to reapply to take the exam, albeit not until the July 2008 bar exam, and then only with a positive psychological assessment. Because of the applicant's youth and inexperience with standards for teaching young women close to his own age, we accept the board's recommendation and allow him to reapply to take the bar exam. But we require that he show a longer period of rehabilitation.

{¶ 38} We disapprove the character and moral qualifications of this applicant for admission to the Ohio bar and deny him permission to take the Ohio bar examination. The applicant may reapply, in accordance with Gov.Bar R. I(3), to take the bar examination to be administered in July 2009. In reapplying, the applicant must submit a favorable psychological assessment prepared by a qualified medical professional.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———————

Carroll R. Creighton, pro se.

Jones Day and Pearson N. Bownas, special investigator for the Supreme Court Board of Commissioners on Character and Fitness.